UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

_____

UNITED STATES OF AMERICA,        CRIMINAL ACTION

Docket No:  2:16-cr-156-NT

-versus-

PARTIAL TRANSCRIPT

LUCAS HEINDENSTROM,

Defendant

_____

Transcript of Proceedings

Pursuant to notice, the above-entitled matter came on
for **Sentencing** held before **THE HONORABLE NANCY TORRESEN**,
United States District Court Judge, in the United States
District Court, Edward T. Gignoux Courthouse, 156
Federal Street, Portland, Maine, on the 28th day of
November, 2018, at 1:07 p.m. as follows:


Appearances:

For the Government:   Jamie R. Guerrette, Esquire
                      Assistant United States Attorney

For the Defendant:    Robert C. Andrews, Esquire




Tammy L. Martell, RPR, CRR
Official Court Reporter

(Prepared from manual stenography and
computer aided transcription)

```
 1                    (Open court.  Defendant present.)

 2              THE COURT:  Good afternoon.  All right.  The

 3    Court has before it for determination and imposition of

 4    sentence United States versus Lucas Heindenstrom.  The

 5    docket number is 16-cr-156-NT.  Would counsel please

 6    enter your appearances.

 7              MR. GUERRETTE:  Jamie Guerrette for the United

 8    States, Your Honor.

 9              THE COURT:  Mr. Guerrette.

10              MR. ANDREWS:  Robert Andrews for Lucas

11    Heindenstrom, Your Honor.

12              THE COURT:  Mr. Andrews.  And, Mr. Guerrette, as

13    far as victim notification.

14              MR. GUERRETTE:  That has been done, Your Honor,

15    and I should alert the Court that the Gavin family is

16    present in the courtroom today.  Mr. Gavin's father,

17    mother and sister.  And Ms. Gavin, Kyle's mother, is

18    going to want to be heard.

19              THE COURT:  All right.  Good.  Thank you.  All

20    right.  Sir, if you would stand.  Are you Lucas

21    Heindenstrom?

22              THE DEFENDANT:  Yes.

23              THE COURT:  And are you the defendant named in

24    the indictment before the Court?

25              THE DEFENDANT:  Yes.
```

1          THE COURT:  How far did you go in school?

2          THE DEFENDANT:  I -- I got kicked out of school

3    my junior year.

4          THE COURT:  Mm-hmm.  And you ended up getting

5    your GED; is that right?

6          THE DEFENDANT:  Yes.  Yes, ma'am.

7          THE COURT:  Have you used any alcohol or drugs

8    within the last 24 hours?

9          THE DEFENDANT:  No.

10          THE COURT:  Do you understand why you are here

11    today?

12          THE DEFENDANT:  Yes, ma'am.

13          THE COURT:  All right.  I find the defendant

14    competent to be sentenced today.  You are here in court

15    with your counsel, Mr. Andrews.  Do you authorize Mr.

16    Andrews to speak and act on your behalf today?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Mr. Andrews, has the defendant

19    received a copy of the written presentence investigation

20    report that was last revised on November 26th of 2018?

21          MR. ANDREWS:  Your Honor, I have not been able

22    to get him a copy of the second revised; although, I

23    have discussed the changes made with him in some detail.

24          THE COURT:  All right.  All right.  Then let me

25    take it from the first revised report.  Have you had a

1    chance to go over that report carefully with him?

2         MR. ANDREWS:  Yes, Your Honor.

3         THE COURT:  Okay.  I understand there have been

4    a few last minute changes that were made to the report,

5    mostly having to do with some of the accomplishments

6    that Mr. Heindenstrom has achieved at CCJ.

7      Were there any other significant changes that you

8    can think of?

9         PROBATION OFFICER:  Your Honor, the only other

10   changes were I updated two of the pending cases.  One

11   that's -- the one -- the state -- underlying state

12   charge that was related to this case has since been

13   dismissed, I reflected that change.  I updated the

14   pending date for the other charge.  And the only other

15   change was to basically say that the 2018 manual was

16   used which has no impact on the guideline calculation.

17        THE COURT:  Okay.  All right.  So it is a very

18   similar report, so I am going to ask Mr. Heindenstrom

19   questions about the -- the report that you did review

20   with him.  I take it you did review the first

21   presentence investigation report with him?

22        MR. ANDREWS:  I reviewed the unamended

23   version --

24        THE COURT:  Okay.

25        MR. ANDREWS:  -- and the amended version.

1        THE COURT:  Okay.  And that -- by the amended

2    version you are referring to the one that was identified

3    as the --

4        MR. ANDREWS:  4/18/17, Your Honor.

5        THE COURT:  Okay.  Yep.  So you have reviewed

6    that with him?

7        MR. ANDREWS:  I have, Your Honor.

8        THE COURT:  All right.  So let me ask you about

9    that report because but for a few changes that the

10    probation officer just described it is essentially the

11    same report.  Is there -- what I -- what I want you to

12    know is that I use the report to help me decide what an

13    appropriate sentence is going to be.  So I want know if

14    you have had enough time to review the report with your

15    counsel.

16        THE DEFENDANT:  Yes, Your Honor.

17        THE COURT:  And knowing that I use that report

18    to form the basis for my sentence, is there anything

19    that's contained in the report that you believe is

20    factually incorrect?

21        THE DEFENDANT:  No.

22        THE COURT:  All right.  So you can have a seat.

23        MR. ANDREWS:  Your Honor, if I might address one

24    particular issue.

25        THE COURT:  Okay.

1          MR. ANDREWS:  On the second revised report, Your

2     Honor, the cover page did not update his GED, and I

3     asked that that be updated and the language that says no

4     high -- no HS diploma be stricken.

5          THE COURT:  Okay.  That education would need to

6     be changed, right, because he does have his GED now?

7          PROBATION OFFICER:  I believe they would look in

8     the body of the report, but I can certainly change that.

9          THE COURT:  Yeah, let's just do that, because

10     that makes a difference once you get into the BOP.

11          PROBATION OFFICER:  Correct.

12          THE COURT:  Okay.  All right.  We'll -- we'll

13     have that change reflected.

14          MR. ANDREWS:  Thank you, Your Honor.

15          THE COURT:  Okay.  So I want to start to dig in

16     on the areas that are in dispute.  You can have a seat,

17     Mr. Heindenstrom.  So there were three objections that

18     were noted in the presentence report.  The first -- I

19     should ask you, Mr. Andrews, I mean the big issue here

20     is this upward departure issue; but I want to know which

21     of these objections you are still pursuing, if you are

22     still pursuing any of them.

23          MR. ANDREWS:  We are not pursuing any of the

24     objections that go into the guideline calculation other

25     than whether there is a upward departure available in

 1   this case.

 2        THE COURT:  Okay.  So we're -- we're only

 3   dealing with the question of the departure then.

 4        MR. ANDREWS:  That's correct.

 5        THE COURT:  And how do you want to proceed on

 6   that?

 7        MR. ANDREWS:  Well, Your Honor, what I think

 8   makes some sense is if we did the presentation with

 9   respect to Dr. Arden, and then we argued whether -- and

10   the Court perhaps gave us a ruling about what it was

11   thinking in terms of the upward departure, and then

12   allowing us to address the variant sentence issue.

13        THE COURT:  Okay.  All right.  I see you have --

14   I see you have the doctor on the -- on the line.

15        MR. ANDREWS:  The -- I want to make a slightly

16   unusual request, Your Honor.  Given the seriousness of

17   why we're here, I would like to take a second to

18   directly address the Gavin family, with the Court's

19   permission.

20        THE COURT:  Do you want to do that now?

21        MR. ANDREWS:  Yes, Your Honor.

22        THE COURT:  All right.

23        MR. ANDREWS:  My name is Robert Andrews, and I

24   represent Lucas in this matter.  I have been doing this

25   for about 18 years, and I have never had occasion to

1    address a victim's family directly.  Mostly because I

2    worry that it won't be productive and it may cause more

3    harm than good.

4        I read your victim impact statement.  I find it very

5    moving, and an appropriate tribute to Kyle, your son.

6    I'm sorry that it is your son's loss that brings us all

7    here today.

8        I am going to have to make some arguments that might

9    be unwelcome, but I want you to know that I admire the

10   sacrifices your son has made, and that whatever happens

11   here today, or whatever I say, none of that changes.  I

12   appreciate you giving me this moment to talk to you.

13             UNIDENTIFIED:  Thank you.

14             MR. ANDREWS:  Your Honor, our first witness is

15   Dr. Arden.

16             THE CLERK:  Please raise your right hand.  Do

17   you solemnly swear that the testimony you shall give in

18   the cause now in hearing shall be the truth, the whole

19   truth, and nothing but the truth so help you God.

20             THE WITNESS:  I do.

21             THE CLERK:  Please state your name and spell

22   your last name for the record.

23             THE WITNESS:  I am Dr. Jonathan, middle initial

24   L, last name is Arden.  It is A-r-d-e-n.

25                     DIRECT EXAMINATION

1  BY MR. ANDREWS:

2  Q.   Good morning, Dr. Arden.  My name is Robert Andrews.

3  I don't think that we have ever seen each other either

4  video or in person, so I wanted to introduce myself.  I

5  am here to ask you some questions about your role in

6  reviewing some of the materials related to the passing

7  of Kyle Gavin.  Do you understand my purpose?

8  A.   Yes, I do, sir.

9       MR. ANDREWS:  Okay.  At the onset, Your Honor,

10  the Government and I have stipulated both to his

11  qualifications and his ability to be an expert and the

12  admissibility of Defendant's Exhibit 1 and Defendant's

13  Exhibit 2.  Defendant's Exhibit 1 is Dr. Arden's CV, and

14  Defendant's Exhibit 2 is Dr. Arden's report generated

15  for the purpose of this hearing.

16       THE COURT:  Are you moving those now?

17       MR. ANDREWS:  I am, Your Honor.

18       THE COURT:  Any objection?

19       MR. GUERRETTE:  No, Your Honor.

20       THE COURT:  Okay.  Defendant's 1 and 2 are

21  admitted.

22  BY MR. ANDREWS:

23  Q.   Dr. Arden, what materials did you review for the

24  purpose of your letter that you wrote on August 28 of

25  2017?

1    A.   Materials I reviewed are listed under the -- the

2    heading of materials reviewed at the bottom of the first

3    page of that document, now Defendant's 2, and in summary

4    the York Police Department documents including reports

5    and statements and their probable cause memo;

6    photographs taken of the death scene and some of the

7    items of evidence; the documents from the office of the

8    -- the office of chief medical examiner for the State of

9    Maine which consisted of an investigative report and

10   examination report; the toxicology report which was

11   performed by an outside laboratory called NMS

12   Laboratories, particularly the postmortem toxicology

13   from the samples taken from Mr. Gavin; and then finally

14   the death certificate issued for Mr. Gavin.

15   Q.   Are these materials the kinds of materials that an

16   expert would -- in your field would customarily rely on

17   to form his opinions about the cause of death and the

18   circumstances of death?

19   A.   Yes, they are.

20   Q.   Okay.  And were these materials that you reviewed

21   sufficient for you to form an opinion?

22   A.   They were, sir.

23   Q.   Okay.  Now, I want to talk first about the cause and

24   -- of death in this matter.  What was the formal cause

25   of death listed in the certificate of death in -- for

1  Mr. Gavin?

2  A.   The precise wording for the cause of death that was

3  entered into the death certificate for Mr. Gavin was

4  acute intoxication due to the combined effects of

5  ethenol, methanol, and fentanyl.

6  Q.   Would it be a -- would it be a -- would it be a --

7  an accurate characterization to call this a combined

8  theory of intoxication?

9  A.   Yes, sir.  It is both as an accurate representation

10  and in fact reflective of the words used by the medical

11  examiner on the death certificate that indeed this is an

12  intoxication that was a combination of effects of three

13  different substances.

14  Q.   Now, is it possible for -- from the facts that you

15  reviewed to separate any of these substances out as a

16  cause -- or a cause, in fact, of death?

17  A.   No, exactly the opposite is the case in my opinion.

18  That it is not reasonable to separate any one of these

19  three substances in this instance, in this death, to be

20  the cause of death or the cause of death in fact.  In my

21  opinion it is indeed the combination of all three which

22  must be included to explain adequately his death.

23  Q.   Okay.  Now, can you explain the mech -- the -- the

24  -- the body process that these three combined substances

25  create to result in death?

A.   Yes.  There is one primary mechanism and one

secondary mechanism related to one of the three drugs in

his system.  Primarily -- ethanol and methanol, by the

way, are alcohols.  Ethanol being the type of alcohol

that is found in drinking beverages.  Methanol is a

solvent that is commonly referred to as wood alcohol not

intended for drinking.  And then the third substance was

fentanyl which is a particular type of an opioid drug or

medication.

All three of these substances, the two alcohols and

the fentanyl opioid, primarily act by a mechanism of

central nervous system depression so they lessen or

depress the functioning of the central nervous system,

or in plain language the brain.  And those effects may

go on in many different parts of the brain having

various effects; but primarily they act to lessen one's

degree of consciousness, they act to lessen one's degree

of responsiveness, and ultimately in the more severe

instance, such as a fatality, they act to cause

respiratory depression.

In other words, the drive to breathe generated by

the brain is lessened or diminished to the point where

the person does not breathe adequately or rapidly

enough, and the potential there being that sufficient

respiratory depression and brain function depression can

1  lead to death.

2      The only other point, as I said a secondary

3  mechanism, is that methanol, the wood alcohol, also has

4  a metabolism such that it is broken down into a

5  different chemical called formic acid which in and of

6  itself is toxic and can cause acidification of the blood

7  or the system of the person which in and of itself is a

8  harmful mechanism in addition to the primary mechanism

9  of central nervous system and respiratory depression.

10 Q.   You mentioned a term there that I -- I am going to

11 ask you to explain a little bit.  You mentioned

12 metabolism.  Could you explain what is important about

13 metabolism?

14 A.   Metabolism in general is the process by which the

15 body chemically processes any foreign chemicals

16 introduced into it.  That was a kind of obtuse way of --

17 of indicating if you -- if you take a substance like a

18 drug or a medicine and it gets absorbed into your

19 bloodstream, in addition to circulating around the body

20 and being distributed by the bloodstream the body then

21 starts to act on that chemical and to break it down.

22 And so that is the process of metabolism, and it is

23 important for a number of reasons.  In part because it

24 is the way that the body processes -- processes and

25 breaks down chemicals such that you don't want to have

1    the -- you know, the ultimate blood concentration to

2    stay that way forever.  Sometimes that is a detoxifying

3    process.  Metabolism also therefore limits the -- the

4    effect and the time frame of effect of something that is

5    put into your system.  And, again, it doesn't

6    necessarily matter if we're talking about something good

7    or something bad.  It could be a therapeutic medication;

8    it could be a toxic poison.

9        The other aspects of metabolism include that

10   sometimes metabolism will break a drug or a medicine

11   down into another product that itself may still be

12   active or may still be toxic.

13       And, finally, just to be complete, metabolism is

14   also related to the process of excreting drugs or the

15   byproducts of the drugs.

16   Q.   So -- and I just want to -- to sort of summarize, it

17   is -- it is a way that the body processes substances

18   that are introduced into it and some of those substances

19   produce metabolites which are either changed chemicals

20   that come from the original substance and may have an

21   effect or may result in being excreted from the body?

22   A.   Yes, sir.

23   Q.   Okay.  And is it also possible to get a sense of

24   timing based on the amount of metabolization of a

25   particular substance?

1    A.    Sometimes one can make some inferences about timing

2    depending upon what substance it is, how much is

3    present, and how much metabolite is or is not present,

4    yes, sometimes that can be used to make a judgment as to

5    range of timing.  Perhaps not a very precise, you know,

6    down to the minute or second thing; but, yes, that is

7    one of the -- one of the potential uses of the analysis

8    including the metabolites.

9    Q.    Okay.  So when you introduce something into your

10   body, that metabolization begins almost as soon as it is

11   absorbed?

12   A.    Yes, you -- the -- the metabolism does begin

13   essentially as soon as the -- the -- the substance is in

14   the bloodstream and circulating.  Of course it will take

15   some time to get a substantial amount of metabolism, but

16   the process should begin pretty much at the beginning of

17   the absorption of the pros -- of the substance.

18   Q.    Now, you reviewed the toxicology report from NMS in

19   this matter; correct?

20   A.    Yes, sir.

21   Q.    Okay.  Was there evidence of metabolites in the NMS

22   report?

23   A.    Yes, there was.

24   Q.    Okay.  And what evidence of metabolites were found,

25   or was found?

1    A.   Actually there are two substances represented in the

2    report.  One which was not related to his cause of death

3    which is called delta-9 THC.  That is the active

4    component of marijuana products.  And, in fact, there

5    was indeed also delta-9 carboxy THC present which is an

6    example of showing metabolism.

7        More germane to the cause of death, Mr. Gavin had

8    fentanyl at a certain concentration, it is actually 5.7

9    nanograms per milliliter, in his blood.  This is

10   postmortem blood sample.  And he also had norfentanyl

11   which is the first major metabolite of fentan --

12   fentanyl, excuse me, and that was present at a much

13   lower concentration 0.23 nanograms per milliliter.

14   Q.   Okay.  So there is evidence of metabolization of

15   fentanyl; correct?

16   A.   Yes, sir.

17   Q.   Okay.  Is there evidence of metabolization of

18   methanol?

19   A.   We have no evidence concerning metabolization of

20   methanol because the primary metabolite, formic acid,

21   was not tested for.

22   Q.   Okay.  So that doesn't mean that it wasn't present,

23   that just means that we don't have any data that

24   demonstrates at what point the process of metabolization

25   was occurring for methanol?

1   A.    That is correct, sir.

2   Q.    Okay.  So then the inference or the theory from that

3   would be that we wouldn't know if methanol had a higher

4   concentration because it had been metabolizing for a

5   period of time or whether there was formic acid in the

6   blood that was a secondary cause -- or potential cause

7   of death; is that correct?

8   A.    That is correct.

9   Q.    Okay.  Now, you reviewed the medical examiner's

10  report for this matter; right?

11  A.    Yes, sir.

12  Q.    Okay.  In your opinion was that investigation

13  adequate enough to make a determination about what point

14  -- or about the methanol ingestion or at what point it

15  would have been in the process of metabolization?

16  A.    No, sir, it was not.

17  Q.    Okay.  And why wasn't it?

18  A.    Well, I have two concerns.  One is that no autopsy

19  was performed which really would have been the more

20  appropriate approach to the investigation and

21  certification of the cause and manner of this death

22  which would have in part related to your question as to

23  trying to determine source of methanol, when it was

24  taken, at what stage we were at as far as absorption and

25  -- and -- ingestion versus absorption I should say.

1        Even more importantly, though, the investigation,

2    per se, was not adequate because the presence of

3    methanol in the system of a person is highly unusual.

4    Methanol is not commonly ingested, certainly not

5    intentionally, and so this is a very unusual really a

6    striking finding in the toxicology results.

7        And because it is so unusual, and because we rarely

8    see it as a cause of death or a contributing factor to a

9    cause of death, and because it is outside of the realm

10   of what people commonly do take either for recreational

11   purposes or abuse purposes, we have really no

12   investigation that indicates the source of the methanol,

13   when it was taken, why it was taken.

14       It is -- it is a highly unusual finding that really

15   demands an explanation, and we have no investigation to

16   try to provide that explanation.

17   Q.   Now, are there professional guidelines that would

18   suggest that an investigation was necessary here?

19   A.   Oh, yes, there are -- there are various forms of

20   guidelines and standards that very strongly suggest.  I

21   can tell you from experience of having practiced

22   forensic pathology for about 35 years that investigation

23   into the circumstances of death is the very root of what

24   we do in the field of medical-legal death investigation.

25       You cannot determine cause and manner of death

1    adequately or appropriately without a thorough

2    investigation, and the generality that pertains to that

3    is that whatever is most pertinent and certainly

4    whatever is most unusual needs to be explained.

5        There are guidelines for medical-legal death

6    investigation some of which have been codified by the

7    National Association of Medical Examiners, some have

8    been published in other venues including some -- some

9    investigative guidelines by the United States Department

10   of Justice.

11       The National Association of Medical Examiners has a

12   set of accreditation procedures that we call it the

13   checklist by which offices, medical examiner offices,

14   get accredited.  That's the -- that is -- those are the

15   criteria by which they are judged.  They include issues

16   about investigation.

17       The National Association of Medical Examiners has

18   issued and promulgated forensic autopsy performance

19   standards that relate to issues such as performing

20   autopsies on deaths that appear to be due to

21   intoxications.  So, yes, there are -- there are

22   guidelines and standards in publications that reflect

23   what I have just offered you.

24   Q.   And is it your opinion that those guidelines were

25   not followed here?

A.   Yes, sir, it is my opinion, my judgment, that many

of those guidelines were not followed here.

Q.   Okay.  Now, there were blood samples taken, though;

correct?

A.   Yes, sir.

Q.   Okay.  And under what circumstances were those blood

samples taken?

A.   The circumstances were that the medical examiner

performed a -- an external examination of the body, and

based upon the circumstances and the external

examination, and a very rapid screening type of test on

a urine sample that was taken from the body, the belief

was that they were dealing with a death due to a drug

overdose, and so then in the -- in the context of an

external examination blood samples were drawn from the

body and sent to the laboratory.  The distinction being

here that this is not in the context of an autopsy.

Q.   Okay.  And I just want to make it clear, but in none

of these tests that were performed was any indication of

-- or any testing other than the toxicology report for

methanol resulted in the discovery of any metabolites of

methanol?

A.   That is correct.

        MR. ANDREWS:  I have nothing further, Your

Honor.

```
 1           THE COURT:  Cross-examination?
 2                    CROSS-EXAMINATION
 3   BY MR. GUERRETTE:
 4   Q.   Good afternoon, Mr. Arden.
 5   A.   Good afternoon, sir.
 6   Q.   My name is Jamie Guerrette.  I am the Assistant U.S.
 7   Attorney who is prosecuting this case.  I know it is
 8   somewhat clunky sometimes when we're dealing with remote
 9   connections like this, so if you don't understand a
10   question or need me to repeat something just ask; okay?
11   A.   Yes, sir.
12   Q.   I appreciate you being here.  You touched on this a
13   bit in your direct examination, but in rendering your
14   opinion you had an opportunity to review a number of
15   different materials; correct?
16   A.   Yes, sir.
17   Q.   That included police reports from the York Maine
18   Police Department?
19   A.   Yes, sir.
20   Q.   And also photographs of the death scene essentially
21   that was taken by the York Police Department?
22   A.   Correct, sir.
23   Q.   And that included overviews of room -- of a room,
24   items of evidence, and also photographs of the
25   decedent's body; is that correct?
```

1  A.   Yes, sir.

2  Q.   And you also noted -- I think based on those

3  photographs -- in your report that Mr. Gavin was found

4  deceased sitting on a coffee table slumped over a couch;

5  is that right?

6  A.   That is correct, sir.

7  Q.   Based on your professional opinion, sir, would you

8  agree that the death appeared to be sudden based on the

9  posture of how the body was found?

10  A.   The posture and positioning of how he was found is

11  consistent with a sudden death, but it is not strictly

12  indicative of that.  He could have been sitting in that

13  position and had a sudden death and then slumped over

14  and would have been found that way.  He could also have

15  had a combined intoxication by three central nervous

16  system depressants which in essence put him to sleep,

17  into a coma, at which point he has slumped down into

18  that position and never awoken, never -- he didn't

19  survive.

20       So given the nature and the mechanism of the three

21  substances that did actually cause his death, those

22  don't typically cause a sudden death.  And the posture

23  in which he was found, although it is consistent with a

24  sudden death, is also consistent with somebody who

25  simply lost consciousness while sitting there and

1    slumped.  So I wouldn't call it -- call the latter a

2    sudden death.

3    Q.  So either way he would have lost consciousness while

4    seated on a coffee table and just slumped over and

5    eventually passed away; correct?

6    A.  Yes, sir.

7    Q.  And it is common, based on your experience, for

8    medical examiners and investigators to consider how a

9    body is found in determining cause of death?

10   A.  Yes, it is.

11   Q.  It is -- it is clear, Dr. Arden, from your -- your

12   CV that you have a wealth of experience and you were

13   previously a medical examiner.  Specifically focusing on

14   overdose-related deaths, is it common in your

15   experience, or uncommon, for death to occur suddenly?

16   A.  It depends entirely upon what type of overdose we

17   are dealing with.  As two examples, two different

18   examples, stimulant drug-related deaths, the prototype

19   being cocaine, very frequently do occur quite suddenly.

20   People can be active and conscious and have cardiac

21   arrest and basically die very quickly.  Opioid-related

22   deaths, or other deaths related to central nervous

23   system and respiratory depressants, typically I would

24   not consider sudden deaths because those people tend to

25   become comatose, stay in a comatose condition for some

1    period of time, and then not recover.

2    Q.   And in the range of opiate-related deaths that would

3    include substances such as heroin or fentanyl; right?

4    A.   Yes, sir.

5    Q.   In your work do you keep up with the latest drug

6    trends either through conferences, trainings,

7    literature, or the like?

8    A.   Yes, I keep up with drug trends -- current drug

9    trends in part from conferences, in part from

10   literature, in part from my work with the National

11   Association of Medical Examiners where we're on the

12   national front of -- of trying to promote medical-legal

13   death investigation and so on, so, yes, sir.

14   Q.   So based on your experience can you offer any

15   insight to the Court with regard to the spike in

16   overdoses that have resulted from the emergence of

17   fentanyl use and distribution of fentanyl?  Have you

18   seen that?

19   A.   Yes, I have, sir.  There has been a growing opioid

20   problem -- it is usually these days referred to as a

21   crisis or epidemic -- that's been going on for a number

22   of years now.  And although the opioid crisis began with

23   other opioids rather than fentanyl, in more recent years

24   fentanyl has been seen with increasing frequency.  It

25   has been seen as a substitute or -- or a -- an

1    adulterant in -- in what is marketed as heroin.  Various

2    fentanyl analogs have also come on the scene especially

3    in the -- in more recent years.  These are slightly

4    modified molecules of fentanyl.  So this has indeed

5    become one of the latest waves of the opioid crisis and

6    it has assumed great importance in terms of causing

7    toxicity and deaths.

8    Q.   And have you personally seen an increase in the

9    number of cases you have been asked to consult in that

10   involve fentanyl?

11   A.   Both the cases I have consulted on and although I --

12   I am primarily a consultant in this phase of my career I

13   still do part-time medical examiner work in West

14   Virginia, and West Virginia is really the epicenter of

15   the opioid crisis.  So I have seen it both in the case

16   work that I have done for medical examiner and in my

17   consulting work.

18   Q.   Okay.  I want to turn to your report for a minute.

19   A.   Yes.

20   Q.   Do you have that handy?

21   A.   Yes, sir.

22   Q.   In your report you concur with the conclusion of the

23   Maine medical examiner that death was caused by the

24   combined effects of three toxins, ethanol, methanol, and

25   fentanyl; is that right?

1    A.    Yes, sir.

2    Q.    And this conclusion was rendered by the medical

3    examiner after they received results of a blood test

4    that was performed by NMS Laboratory in Pennsylvania; is

5    that also right?

6    A.    Yes, sir.

7    Q.    And in your report you note that the toxicology

8    report issued around May 2nd, 2016; is that correct?

9          Or the cause of death was -- was issued around

10    May 2nd, 2016?

11    A.    The cause of death, yes, sir.

12    Q.    And that would have been based on the report that

13    was issued on April 26th of 2016; right?

14    A.    Yes, sir.

15    Q.    And that was your --

16    A.    That is correct.

17    Q.    That was nearly a month after the overdose death in

18    this case?

19    A.    Correct, sir.

20    Q.    And was that the first time, in the various reports

21    and information you reviewed, that methanol was observed

22    as a toxin in Mr. Gavin's system?

23    A.    Yes, it was.

24    Q.    So the -- that information was not available when

25    the ME performed their examination on April 1st of 2016;

1   correct?

2   A.   That is correct.

3   Q.   And their preliminary presumptive urine test was

4   only positive for fentanyl and I believe THC, marijuana?

5   A.   That is correct.

6   Q.   You testified earlier that all three of these

7   substances are central nervous system and respiratory

8   depressants; right?

9   A.   Yes, sir.

10  Q.   And they acted basically together to cause the

11  primary mech -- or to -- acting together they were the

12  primary mechanism of death?

13  A.   Yes, they did act together, and that was the -- the

14  primary mechanism of death the fact that they are all

15  central nervous system and respiratory depressants.

16  Q.   I know in your report, sir, that you -- you mention

17  that it is -- it is difficult to examine the substances

18  in isolation because they were really acting together in

19  concert; but if you would entertain me, I would like to

20  ask you questions about each of the substances that were

21  found in Mr. Gavin's blood.  Is that fair?

22  A.   Yes, sir.

23  Q.   I want to first talk to you about the ethanol.  That

24  was reported to be a .12 blood alcohol content; correct?

25  A.   Yes, sir.

1    Q.    And I believe you note in your report that Mr. Gavin

2    had drinks with an acquaintance the evening before so

3    that would have been explained.

4    A.    That is correct.

5    Q.    And a .12 BAC for alcohol is not an extraordinarily

6    high amount, correct, it is just slightly over the limit

7    of .08?

8    A.    It is.

9    Q.    And --

10   A.    Well, that's 50 percent over the legal limit of --

11   of .08.

12   Q.    Right.

13   A.    And it is significantly elevated, but it is

14   typically not in the realm -- in the range that would be

15   considered fatal.

16   Q.    And you did note that it is not independently lethal

17   at that range?

18   A.    Yes, sir.

19   Q.    And you talked a little earlier, too, during your

20   direct examination about metabolism and being able to

21   look at the metabolites in someone's system and try to

22   determine time of death; right?

23   A.    Not so much time of death but time frame of use of

24   the -- of the substance.

25   Q.    Would the .12 in his system, Dr. Arden, suggest that

 1    Mr. Gavin had not yet had a chance to metabolize the

 2    alcohol that he consumed in his system?

 3    A.    It indicates that he had not had enough time to

 4    metabolize all of it, but it did -- it would not

 5    indicate that he was not metabolizing.  He undoubtedly

 6    was metabolizing until he died, but he clearly did not

 7    metabolize all of it.

 8    Q.    I guess what I am -- what I am trying to get at, if

 9    the death had occurred the following morning -- so he

10    has drinks on the evening on March 30th.  If the death

11    had occurred sometime in the morning of March 31st, is

12    it fair to say that the -- the alcohol in his system at

13    that time would have metabolized through his body?

14    A.    It is fair to say that a substantial amount would

15    have metabolized.  It is not fair to say, based on that

16    information, that he would have been down to a zero

17    blood alcohol.  That would depend upon how high his

18    blood alcohol concentration had peaked initially.

19    Q.    Okay.  Can we look at the fentanyl for a minute as

20    well?

21    A.    Yes, sir.

22    Q.    And on the NMS lab's toxicology report, referring to

23    page one of that report, the lab determined that

24    Mr. Gavin had 5.7 is it nanograms per milliliter in his

25    system?

1    A.   Yes, it is, sir.

2    Q.   In your experience -- I think you touched on it

3    earlier -- but have you had occasion to conduct

4    examinations on individuals who have died of fentanyl

5    overdoses?

6    A.   I have.

7    Q.   And also I think your testimony is you have had an

8    opportunity to consult in those types of cases?

9    A.   Yes, sir.

10   Q.   And in both instances have you either performed

11   examinations or consulted in cases where death has

12   resulted from a fentanyl overdose where the amounts were

13   less than 5.7 nanograms per milliliter?

14   A.   I cannot independently recall the specific

15   toxicology results and blood concentrations of prior

16   cases that I have either worked on primarily or

17   consulted on.

18       I can tell you with fairness -- I am not trying to

19   duck your question entirely.  In fairness, based on

20   experience and the literature, 5.7 nanograms per

21   milliliter is within the very broad range of

22   concentrations that have been associated with fatality.

23   It is not at the upper end of that range, it is closer

24   to the lower end.  But I am sure there are examples of

25   people who have died from that concentration or lower;

 1  but there are many more examples of people who died at

 2  higher concentrations.

 3      And -- and, to be fair, the -- the blood

 4  concentration ranges for opioids that relate to

 5  therapeutic, toxic, and lethal are very highly

 6  overlapping.  It is the nature of opioids and -- and

 7  physiologic tolerance that people develop to them.

 8  Q.   Referring back to that report, the toxicology

 9  report, I direct your attention to page three.  In the

10  comment section of that report the lab noted that

11  fentanyl is reported to be 80 to 200 times as potent as

12  morphine and has a rapid onset of action.

13      Based on your professional experience, sir, would

14  you agree with that?

15  A.   Yes, sir.

16  Q.   Including the rapid onset of action?

17  A.   Yes, sir.

18  Q.   What would that mean?

19  A.   It means that the opioid effect occurs quickly once

20  you get the drug into your system.  It depends, of

21  course, upon how you deliver the drug.  If you deliver

22  it intravenously, it will be particularly rapid.  If you

23  deliver it by a patch, for instance, trans -- cutaneous

24  patches that they do use for fentanyl, it takes a longer

25  time for absorption; but once you absorb it, it -- it

1    begins to act rapidly.

2    Q.   If it was delivered intravenously, could that occur

3    within seconds?

4    A.   Physiologic or pharmacologic effects could occur

5    within seconds.  You are unlikely to die within seconds,

6    but the effect of it could begin within seconds, yes,

7    sir.

8    Q.   Is that including unconsciousness?

9    A.   Unconsciousness can occur very rapidly with

10   fentanyl.  I -- I don't personally administer it to

11   people, I am not an anesthesiologist; but within --

12   within relatively short period of time, seconds or

13   multiple seconds, I think that could indeed occur.

14   Q.   Again referring to the report, sir, it continues

15   that in fatalities from fentanyl blood concentrations

16   are variable -- and I believe you referenced this a

17   short time ago -- and have been reported as low as three

18   nanograms per milliliter.  Would you also agree with

19   that?

20   A.   I have no -- I have no reason to doubt that this is

21   correct.  I will note for you that fatalities at as low

22   as three nanograms per milliliter may or may not be

23   fatalities purely from fentanyl.  We would have to go to

24   the primary literature to see if there are reported

25   cases of fatality from fentanyl at that low a

1  concentration without the additive effect of other

2  drugs.

3  Q.  Would you agree, however, that Mr. Gavin's blood

4  concentration was nearly two times the amount where

5  fatalities have at least been observed?

6  A.  It is -- it is nearly two times that three nanograms

7  per milliliter that has been quoted here as -- as a low

8  end of -- of the spectrum.

9  Q.  So would the amount of fentanyl in his system

10  possibly be sufficient to cause death independently of

11  any other substance?

12  A.  If you are asking me a hypothetical, yes, it is

13  within the realm of possibility.  That is different from

14  my opinion about Mr. Gavin, per se, but within the realm

15  of all possibilities.  Not necessarily probabilities,

16  but, yes, it is within the realm of possibilities.

17  Q.  At the very least in this case the report -- or the

18  medical examiner concluded, and I believe your

19  conclusion is this as well, that each of the substances

20  was a factor in the cause of death?

21  A.  Correct, in combination each was a factor.

22  Q.  So fentanyl, in your opinion, was -- was

23  unquestionably a factor in the cause of death?  It

24  played a role?

25  A.  Right, it -- it was unquestionably a factor among

1    three of which I cannot separate in -- in the actual

2    example of Mr. Gavin.

3    Q.   Before I -- I conclude my questions, sir, I just

4    want to ask you a few questions about methanol.  You

5    testified earlier that it is highly unexpected to find

6    that result in Mr. Gavin's blood; correct?

7    A.   Yes, sir.

8    Q.   It is not ordinarily a substance that someone

9    consumes, that's also correct?

10    A.   That is -- sorry.  That is correct.

11    Q.   I would like to ask you a few questions again

12    referring to page -- I believe it is page three of that

13    toxicology report.  The lab reported back or commented

14    that signs and symptoms associated with methanol

15    ingestion includes severe metabolic acidosis and CNS,

16    ocular and gastrointestinal disturbances.

17        Would you agree that those are effects of ingesting

18    methanol?

19    A.   Yes, sir.

20    Q.   What's metabolic acidosis?

21    A.   Excuse me.  That relates to what I was referencing

22    earlier.  Acidosis is the condition where your -- your

23    bloodstream and -- and in essence your -- your bodily

24    fluids, your -- your bodily -- your system, if you will,

25    is at a level of excessive acidity.  We normally

1    maintain our blood at a pH of about 7.2 to 7.4.

2        pH is a -- a measurement of how -- how -- where on

3    the spectrum something is from strongly acidic to

4    strongly basic, being the opposite, or in the middle is

5    neutral.  So 7.2 to 7.4 is very close to neutral between

6    acid and base.  7.0 is the -- the perfectly neutral

7    level of that.

8        And so if, for instance, your blood pH goes down to

9    6.9 or 6.8, as examples, that's a significantly

10    excessive degree of acidity and that's called acidosis.

11    Q.  What would the signs and symptoms of that

12    potentially be if someone was experiencing that?

13    A.  Well, in part it depends upon the reason for

14    acidosis, but acidosis -- and it depends also on the

15    severity, but acidosis can cause you to breathe more

16    rapidly because your respiratory system can also affect

17    your acid-based balance.

18        And so if the -- if you are chemically becoming too

19    acidotic, if you breathe more rapidly it is a way of

20    trying to blow off carbon dioxide which then should

21    alleviate to some degree the acidosis.  So -- so

22    breathing more or less rapidly, depending upon which

23    direction your acidity has gone, is part of it.  At some

24    point people may just have kind of the general malaise

25    tiredness.

1    If you become very severely acidotic your body's

2    systems start to shut down, and your level of

3    consciousness may decline, your cardiovascular system

4    may shut down.  So you can have anywhere from mildly

5    feeling bad and maybe breathing too fast all the way to

6    death.

7    Q.   And would that take some time to -- to progress or

8    develop in someone's system?

9    A.   Again it very much depends upon the reason for

10   becoming acidotic; but I think in general, yes, that's

11   true.

12   Q.   And how would you describe, sir, CNS, occular, and

13   gastrointestinal disturbances?

14   A.   Well, CNS is central nervous system, and I think

15   that's much more germane to his situation because that

16   includes lessening consciousness, eventually becoming

17   comatose, and that also includes respiratory depression.

18       Occular toxicity of methanol is something that was

19   much better known and much more common many decades ago

20   where people who would either accidentally drink

21   methanol or there was a time -- we're going at least a

22   generation or so before my time -- where when people had

23   difficulty getting drinking alcohol they would drink

24   methanol and people would end up being blind from it.

25   Q.   I guess what I am driving at, if someone consumed

1  methanol would you expect them to start feeling sick,

2  potentially vomit, have blurred vision, stuff of that

3  nature?

4  A.   That is very likely, yes, sir.

5  Q.   And like metabolic acidosis would that generally

6  take time as the body metabolizes or processes the

7  methanol and it becomes more toxic in someone's system?

8  A.   It does take some time.  I really can't put a good

9  time frame on it for you as far -- because, you know,

10 the metabolism will start essentially immediately upon

11 absorption.  In order for the metabolic acidosis to

12 become very severe, yes, it would take more time than a

13 -- than a less severe example.

14      But I mean, in fairness, Mr. Gavin does have a

15 substantial blood methanol concentration, so would it

16 take him more time to become more toxic or have more

17 effects, certainly.  Would it be reasonable to say that

18 at a 120 methanol concentration he had no effects or

19 minimal effects, no, sir.

20 Q.   And then again referring to that report page three

21 it noted in the comment section that fatalities in 20,

22 quote, untreated patients were reported to occur at

23 concentrations between 20 and 630 milligrams per

24 deciliter?

25 A.   Yes, sir.

```
1    Q.   And I believe Mr. Gavin's was 120 milligrams per
2    deciliter; correct?
3    A.   That is correct.
4    Q.   And the mean that was reported in that comments
5    section, or the average, is 190 milligrams --
6    A.   That is correct.
7    Q.   -- per deciliter?
8    A.   That is correct.
9    Q.   And that's in those 20 unique rare cases of
10   untreated patients; right?
11   A.   That is -- that is in -- that is citing to a
12   particular study 20 untreated patients, and, again, we
13   don't know for sure.  My inference here is that this is
14   methanol alone as opposed to in combination with other
15   intoxicants.
16   Q.   And does the fact that only 20 cases are noted in
17   that study, as opposed to what the report was for
18   fentanyl, suggest to you that fatalities from methanol
19   consumption are exceedingly rare?
20   A.   That factor of only 20 cases in that report is not
21   what suggests that to me.  In fairness, in the current
22   day methanol fatalities are indeed quite rare whether
23   alone or in concert with any other intoxicant, but I
24   don't think that's the reason why; but I agree that they
25   are now quite rare.
```

```
 1   Q.   And there would be a window, unlike potentially an
 2   overdose from an opiate such as fentanyl or heroin, to
 3   seek medical attention once you start to experience the
 4   symptoms of that toxicity in your system; right?
 5   A.   You say there would be.  I -- I would prefer to say
 6   there might be.
 7   Q.   Okay.
 8   A.   Again, depending upon the circumstances, the
 9   concentration, the amount, yes, there might be, but not
10   always.
11           MR. GUERRETTE:  Okay.  Thank you, sir.
12   Appreciate your time.
13           THE WITNESS:  Thank you.
14           THE COURT:  Any redirect?
15           MR. ANDREWS:  Yes, Your Honor.
16                    REDIRECT EXAMINATION
17   BY MR. ANDREWS:
18   Q.   You were asked some questions about the role of
19   methanol and most of those questions were focused on
20   what would be the secondary toxicity of methanol, is
21   that -- would you -- would that be a fair
22   characterization?
23   A.   Yes.  Regarding the acidosis, yeah, that is correct.
24   Q.   Okay.  But there is another way that methanol
25   affects the body; right?
```

1   A.   Yes, it is also a central nervous system depressant

2   similar to ethanol.

3   Q.   And that doesn't require the kind of time that

4   causing acidosis would require; correct?

5   A.   Correct.

6   Q.   In fact, the intoxication effect would be almost

7   immediate?

8   A.   It would be rapid.  Similar to the intoxication

9   effect of ethanol in terms of timing.

10  Q.   And -- and doesn't that give the presence of

11  methanol's metabolite a particular importance if someone

12  were trying to figure out which substance he took last

13  or say which substance was going to break the camel's

14  back?

15  A.   That would certainly be a very helpful factor if you

16  were trying to sort out those issues, yes, sir.

17  Q.   Okay.  But we don't have any evidence in this case;

18  correct?

19  A.   Correct.

20  Q.   Okay.  Now, you were also asked some questions about

21  the level of methanol in Mr. Gavin's blood; right?

22       Now, the level itself, right, by itself is not -- is

23  not fatal in the sense that it might not cause a

24  fatality from secondary toxicity; correct?

25  A.   Correct.  It is -- it is not necessarily fatal;

1    although, it is within the realm of what has been

2    reported as fatal.

3    Q.   If you took it last, right, in conjunction with

4    ethanol and fentanyl, could that in fact be the -- the

5    -- I am using the characterization or the -- the straw

6    that broke the camel's back?

7    A.   It could be, yes.

8    Q.   Okay.  So the strict but for cause of death in this

9    matter could in fact be methanol and not fentanyl?

10   A.   Well, it could be -- it could be methanol in the

11   context of already having ethanol and fentanyl onboard,

12   yes, it could have been the straw that broke the camel's

13   back, as we're saying, and it could have been the -- the

14   factor that pushed him over the edge.

15   Q.   Okay.  And in this case the urine sample either

16   wasn't tested for formic acid or it was in such a low

17   amount in the urine that it didn't create a result; is

18   that correct?

19   A.   It -- it wasn't tested for at any point.

20   Q.   And -- well, let me ask you, did you -- did you do

21   some -- some work into trying to discover if there was a

22   way to determine whether there was formic acid?

23   A.   I did.

24   Q.   Okay.  And what were the -- what was the result of

25   that?

1    A.   I called the NMS laboratory and spoke to one of

2    their toxicologists, and I specifically asked whether

3    formic acid would have been detected in the testing

4    system that they used for volatiles.  Volatiles is the

5    very, very broad category that includes ethanol and

6    methanol.  And I was informed by NMS that the testing

7    system that they use -- that was indeed used to detect

8    methanol and ethanol in this case would not have

9    detected formic acid, and furthermore that they would

10   only test for formic acid in urine, not in blood, and it

11   would have to be a specifically requested examination

12   done by a different method.

13   Q.   All right.  And do you have any information that any

14   of that was done in Mr. Gavin's case?

15   A.   Based on the toxicology report that I have, that was

16   not done.

17        MR. ANDREWS:  Thank you, Your Honor.  Thank you,

18   Dr. Arden.  That's all I have, Your Honor.

19        THE COURT:  All right.  Any recross?

20        MR. GUERRETTE:  No, Your Honor.

21        THE COURT:  All right.  I'd just ask a couple of

22   questions if I could.

23        What I hear you saying, Doctor, is that you can't

24   tease out which of these substance actually --

25   substances actually caused the death, that they -- they

1    acted in concert; is that fair?

2         THE WITNESS:  That is correct.  That is correct.

3    Your Honor.

4         THE COURT:  And are you able to tell me -- in

5    the legal language what we're aiming at here is what

6    level of causation has to be shown, and I guess I would

7    ask this:  Would you be able to say that the fentanyl

8    was a concurrent cause of Sergeant Gavin's death?

9         THE WITNESS:  I am not entirely sure I -- I

10   would use or even understand the -- the term concurrent.

11        THE COURT:  Mm-hmm.  Would it --

12        THE WITNESS:  It clearly --

13        THE COURT:  Would it have played a meaningful

14   role in his death, could you say that?

15        THE WITNESS:  In my opinion all three of those

16   substances played a meaningful role in his death.  I --

17   I am not able with reasonable medical certainty to -- as

18   you said to tease out any one or more of them and say

19   this one alone did it, these two together did it to the

20   exclusion of the third.  All three are present.  Given

21   the circumstances, their concentrations, and what we

22   know about those substances, I think they are all

23   significant, they are all contributory; but I cannot

24   identify any one among the three that is the one or the

25   -- the sole cause.

```
 1          THE COURT:  All right.  Thank you very much.  I
 2   have no further questions.  Does anyone want to follow
 3   up?
 4          MR. ANDREWS:  No, Your Honor.
 5          THE COURT:  No.
 6          MR. GUERRETTE:  No.
 7          THE COURT:  All right.  May we let the doctor go
 8   then?
 9          MR. GUERRETTE:  Yes.
10          THE COURT:  All right.  Thank you for helping us
11   today and we're going to disconnect you now.  Thanks for
12   joining us.
13          THE WITNESS:  Thank you, Your Honor.
14          MR. ANDREWS:  Your Honor, there has been some
15   reference to the NMS report.  I know the Government has
16   marked it is an exhibit.  I don't think it was --
17          THE COURT:  Would you get near a microphone,
18   please, so the court reporter doesn't struggle.
19          MR. ANDREWS:  I'm sorry.  There was some mention
20   of the NMS toxicity report.
21          THE COURT:  Right.
22          MR. ANDREWS:  I know the Government has marked
23   it.  They didn't formally enter it.  I would like it to
24   be formally entered.
25          MR. GUERRETTE:  I would offer it now, Your
```

1    Honor.

2              THE COURT:  All right.  Government 1 is

3    admitted.

4              MR. GUERRETTE:  And --

5              THE COURT:  I noticed that it was under seal,

6    and we will keep under that seal then --

7              MR. GUERRETTE:  Thank you.

8              THE COURT:  -- based on the fact that it

9    contains information about Sergeant Gavin.

10             MR. ANDREWS:  Your Honor, I guess I would also

11   ask that Defendant's Exhibit 2 similarly be sealed based

12   on the information contained in the report.

13             THE COURT:  I can't remember what 2 is.

14             MR. ANDREWS:  Two is the opinion.

15             THE COURT:  Oh, the report.  Yeah, all right.

16   Any objection to that?

17             MR. GUERRETTE:  No, Your Honor.

18             THE COURT:  All right.  And then also based on

19   the sensitive medical information contained in there I

20   am going to seal Defendant's Exhibit No. 2.

21             MR. ANDREWS:  Thank you.

22             THE COURT:  All right.  Thank you.  Any more

23   evidence to be offered on this question?

24             MR. ANDREWS:  No, Your Honor.

25             THE COURT:  All right.  Actually, this would be

 1    your burden, I believe, Mr. Guerrette.  Do you want to

 2    argue it at all?

 3          MR. GUERRETTE:  Maybe just hit a few salient

 4    points, Your Honor.  Nothing more than what was

 5    submitted to the Court in the Government's sentencing

 6    memorandum, but we're -- we're proposing, we're

 7    submitting to the Court, Your Honor, that Burrage does

 8    not change the precedent -- the clear precedent in the

 9    First Circuit that allows the Court to depart upward on

10    the basis of death in this case.

11       The specific language citing United States versus

12    Diaz, quote, we see no basis for foreclosing departure

13    under 5K2.1 when a defendant puts into motion a chain of

14    events that risks serious injury or death even when an

15    intent to harm is entirely absent and the defendant was

16    not directly responsible for the death.  Indeed

17    unintended consequences are often the result of reckless

18    behavior.  There is some additional cases that the

19    Government cited.

20       Clearly in this day and age, in the culture, in the

21    environment we're in with the distribution of fentanyl,

22    anybody that's involved in the distribution of this

23    substance, either heroin or fentanyl, with the spike and

24    the rash of overdoses that we're experiencing

25    nationwide, should know that there is a chance that

1  their consumer, their customer, their friend, their

2  acquaintance, is going to overdose from the substance.

3      I don't believe -- I guess the -- the primary

4  argument that we make to the Court, Your Honor, with

5  regard to that guideline provision, it covers a heck of

6  a lot more than just drug trafficking and overdose

7  deaths.  It is intended to cover a whole host of

8  different scenarios where death may be reasonably

9  foreseen to occur, as it did in this case, and we don't

10  think Burrage changes that.  And I don't believe the

11  defendant has been able to cite to a single case, either

12  in this circuit or the -- the sister circuits, that

13  supports that conclusion.

14      But the other argument, Your Honor, I think even if

15  the Court determines that it can't depart upward, this

16  is an offense that carries punishment of zero to

17  20 years.

18      Clearly the Court, under the 3553 factors, retains

19  the ability to vary based on these facts and

20  circumstances.  Even if, at an absolute minimum, the

21  Court determines that it was a contributing factor and

22  not an independently sufficient factor pursuant to

23  Burrage.

24      I don't think there could be any question here.  The

25  defendant doesn't dispute he distributed fentanyl to

1    Mr. Gavin.  There is no question Mr. Gavin ingested it.

2    There is no question it is nearly double the lethal dose

3    where fentanyl has been observed to cause death.

4        And you have testimony before the Court that in

5    combination with ethanol and methanol -- which is

6    admittedly in this case unexplained -- but toward the

7    end of his testimony, Your Honor, it -- I believe the

8    doctor was suggesting that the immediate effects from

9    consuming methanol are not unlike ethanol.  So you are

10   drinking essentially alcohol, or you are consuming

11   alcohol, and you are going to have the effects of

12   alcohol that slowly take place, and you are going to get

13   drunk, right, as -- as time progresses.  But the

14   impression at least that I got from the doctor's

15   testimony is that you are not going to have that sudden

16   you are awake, you are conscious, one second sitting on

17   a coffee table and the next you are keeled over either

18   unconscious or -- or -- or suddenly deceased, as

19   occurred in this case according to those scene

20   photographs which the doctor talked about.

21       So we'd submit that the Court does have the

22   authority on either basis to vary upward, and as the

23   Court is aware in this case there is a -- a binding plea

24   agreement of 96 months, and I guess I will touch on that

25   a little later on.

1          THE COURT:  Yeah, I will get to that in a

2     minute, yep.

3          MR. GUERRETTE:  Okay.

4          THE COURT:  All right.  Mr. Andrews.

5          MR. ANDREWS:  Yes, Your Honor.  I think Burrage

6     has a transformational effect on how we treat these

7     cases.  Burrage doesn't talk about just the standard in

8     the statute.  It talks about defining words, right,

9     resulted from.

10         Now, in this case we submit that the facts are

11     insufficient for the strict but for causation required

12     by Burrage.  Which means that someone would have to be

13     prepared to either say that it was the cause alone or

14     that it was the straw that broke the camel's back.

15         The problem is, is we don't have information in this

16     case that allows for that determination at all either by

17     proof beyond a reasonable doubt, which the First Circuit

18     has spoken on, and which I was kind of surprised the

19     Government didn't mention, but in United States versus

20     Pena they talked about how situations like this -- and

21     it is in footnote five I believe -- don't meet the

22     standard for strict but for, but that it might meet the

23     combination.  What Pena leaves open, Your Honor, is

24     whether that can then be applied in the guidelines.

25         Now, there are other circuits that have addressed

1  this issue in particular, and I don't mean with respect

2  to the variance or with respect to the 5K death

3  resulting policy statement, but I do mean in terms of

4  the death resulting substantial enhancement under 2D,

5  and what they have said is that the statutory language

6  is meant to work in concert with the guideline language.

7  They are indeed the same.  And I think that that

8  principle carries out through all the way down to the

9  policy statement which, yes, there is some variation,

10  but it is not that substantial, it is really the matter

11  of tense.

12      And given that, Your Honor, and given that the First

13  Circuit has shown a preference for interpreting similar

14  words similarly, that the death resulting upward

15  departure is also inappropriate here simply because the

16  Supreme Court has taken a policy position about what's

17  necessary to provide these substantial enhancements to

18  sentences.

19      I would also like to note that there have been some

20  district courts who have addressed this specific issue,

21  and their determination was we don't have the authority,

22  under these kinds of circumstances, to give an upward

23  departure.  What they have said is maybe we have the

24  power to give a variant.  I don't have any appellate

25  decisions, right, that verify that.

1        The problem with the earlier decision from

2    Pennsylvania that I submitted as part of my memorandum

3    is that it is an unreported decision and they sort of

4    disavow the notion that that was based on the fact that

5    someone had died as a result of that traffic accident,

6    and we have -- I -- and I am not even certain what

7    happened in the Second Circuit case where the judge

8    decided that he was going to give notice of the

9    potential upward variance, and I think that this Court

10   is bound by the policy choice, right.

11       There is a policy choice that Burrage establishes,

12   and given that I -- I understand the Court has a vast

13   authority under 3553 to issue a variant sentence.  I am

14   concerned, though, that if the Court sidesteps the

15   policy choice that that reasonableness analysis will

16   cease to have a meaning, and I think that it is

17   important here.

18       I don't want to undercut the importance of what

19   happened here, all right; but there has been a policy

20   choice made, and I think that this Court is bound by

21   that policy choice, and I ask the Court to respect that

22   policy choice at least with respect to the upward

23   departure.  And I will argue various aspects of any

24   potential variance should the Court decide that it wants

25   to upward vary.

1          THE COURT:  All right.

2          MR. ANDREWS:  Thank you.

3          THE COURT:  Well, let me make some rulings on

4    the upward departure and variance situation.  I think it

5    is an interesting argument that you are raising, and I

6    will try to be clear to give you a record that you can

7    take to the First Circuit on this so that they can make

8    the ultimate determination.

9          So the relevant statutes and guidelines that are

10   sort of in play here are 21 United States Code

11   Section 841(b)(1)(c) which states that if death results

12   from the use of a particular substance then a 20-year

13   mandatory minimum applies and the maximum term of

14   imprisonment is life.

15         And the Government did not charge the defendant

16   under the death resulting language of the statute,

17   instead it just charged straight distribution under

18   841(a)(1), and I would imagine that the choice of that

19   charge was largely driven by United States versus

20   Burrage which is a 2014 case in which the Supreme Court

21   held that the results from language in

22   Section 841(b)(1)(c) requires the Government to prove

23   that the decedent would not have died had it not been

24   for the substance provided by the defendant.  So that's

25   essentially what I will call strict but for causation.

1        And then the second relevant guideline or --

2    statutes or guidelines, this is a guideline, is found in

3    the sentencing guidelines at 2D1.1(a)(2).  That's what

4    Mr. Andrews is referring to.  That would set an offense

5    level of 38 if, quote, the offense of conviction

6    establishes that death resulted from the use of the

7    substance.

8        Now, the Government is not arguing that this

9    guideline should apply, and that may be based on the

10   fact that some circuits -- though as far as I know the

11   First Circuit has not weighed in on this, but some

12   circuits have held that this guideline does not apply

13   unless the indictment charged a death resulting case.

14   And there is a circuit split on this.  United States

15   versus Greenough at 669 F.3d 567, which is out of the

16   Fifth Circuit, cites the split, cites the cases that are

17   involved.  And the Greenough point -- court makes the

18   point that 2D1.2(a)(2) of the guidelines really mirrors

19   the language found at 21 United States Code

20   841(b)(1)(C), and that's definitely true, and it is

21   perhaps enough to use the Burrage causation requirement

22   for 2D1.1(a)(2).  But I actually think Greenough is

23   distinguishable from this case because I think the death

24   here is much closer to being intrinsic to the charge as

25   opposed to what was the case in Greenough, but the

1    Government is not pressing on this and I am not going to

2    weigh in on that.

3        Then there is the issue of 5K2.1 which is the

4    sentencing guideline provision that says if death

5    resulted the Court may increase the sentence above the

6    authorized guideline range.

7        Now, the Government is arguing that I should depart

8    upward under this guideline, and they are arguing that a

9    strict but for causation standard is not necessary and a

10   looser standard should apply, and they are citing me to

11   the case of United States versus Pacheco, and cases

12   cited therein, where it -- in Pacheco it was held that

13   the substance that was distributed by the defendant was

14   a contributing cause of the victim's injuries under the

15   sister guideline 5K2.2.  There was not a death in that

16   case but serious bodily injury.

17       And the First Circuit used this what it described as

18   a but for causation but which appears to be a much

19   looser standard which would be that if the substance

20   that was distributed by the defendant was at least a

21   concurrent cause or a meaningful cause of death,

22   meaningful factor in the cause of death, then an upward

23   departure would be permissible under 5K2.2.

24       And you are also citing -- the Government is also

25   citing cases which suggest that a 5K2.1 departure is

1    permitted even when the defendant is not the direct

2    cause of the victim's death where a defendant puts into

3    motion a chain of events that run -- that raises a

4    cognizable risk of death then the upward departure is

5    allowed.

6        So the Government -- or the defendant is arguing, in

7    response to that, that Pacheco has really been abrogated

8    by Burrage, and the defendant claims that I should read

9    the language of the guideline, which after all is very

10   similar to the statutory language construed in Burrage,

11   to require strict but for causation.

12       The fourth relevant guideline was pointed out by the

13   probation office, and that's 5K2.21 of the sentencing

14   guidelines which provides that a court may depart upward

15   to reflect the actual seriousness of the offense based

16   on conduct underlying a potential charge not pursued in

17   the case as part of the plea agreement or for any other

18   reason and that did not enter into the determination of

19   the applicable guideline range.

20       So having heard the doctor, and having read the

21   exhibits that -- before I came in here that the parties

22   offered during the evidentiary portion of the hearing, I

23   am going to make some factual findings.

24       First of all, I find that the defendant provided

25   Sergeant Gavin with the fentanyl that was found in the

1    decedent's system.  I think that's -- I conclude -- can

2    conclude that both from the prosecution version and from

3    the toxicology report.

4        I find that the defendant knew that the substance he

5    was providing, although identified as heroin, contained

6    fentanyl, and the defendant's own admission suggests me

7    -- leads me to that conclusion, and also the text that

8    he sent referring to the fet which he himself admits was

9    a reference to the fentanyl.

10       I find that Sergeant Gavin's death was caused by the

11   combined effects of three toxins; ethanol, methanol, and

12   fentanyl.

13       I find that the fentanyl found in Sergeant Gavin's

14   blood was in an amount of 5.7-nanograms per milliliter.

15       I find that fatalities from fentanyl have been

16   reported with concentrations as low as three-nanograms

17   per milliliter.

18       The amount of fentanyl in Sergeant Gavin's system

19   could possibly have been an independent cause of his

20   death.  I would note that possible is not enough to take

21   you to a preponderance of the evidence, so I don't think

22   the Government has established that the fentanyl in his

23   system could have been an independent cause of his death

24   to a level of a preponderance.

25       The methanol found in Sergeant Gavin's blood was in

1    an amount of 120-milligrams per deciliter.  Fatalities

2    from methanol have been reported with concentrations as

3    low as 20-milligrams per deciliter.  Again, the amount

4    of methanol in Sergeant Gavin's system could have been

5    an independent cause of death.  I can't tell you

6    anything about possibility or probability.

7        It is impossible to say, on the evidence before me,

8    that but for the fentanyl Sergeant Gavin would have

9    lived.  It is impossible to say that the fentanyl was

10   the straw that broke the camel's back.

11       You have got your setup for <u>Burrage</u>.

12       But I can say that fentanyl was a contributing cause

13   of Sergeant Gavin's death.  The expert agreed that it

14   was a meaningful cause, and that's the standard that is

15   set forth in <u>Pacheco</u>.

16       I don't find that the position of the body and the

17   -- really adds a whole lot to it.  I think the

18   Government is putting a lot of weight on that.  I think

19   that's pretty speculative.

20       I would take judicial notice of the fact that the

21   dangers caused by fentanyl was widely known in the state

22   even in March of 2016.

23       I would note and take judicial notice of the fact

24   that the Attorney General had just reported, and it was

25   all over the news, that the 2015 overdoses were

 1    dramatically increased and that they were blaming

 2    fentanyl and heroin for those additional -- the increase

 3    in overdose deaths.

 4        So with regard to my legal conclusions, I am going

 5    to conclude that a departure under 5K2.1 for death

 6    resulting is appropriate on these findings.

 7        I do not believe that just because nearly identical

 8    language is found in the statute 21 U.S.C. 841 that I am

 9    constrained to only depart under 5K2.1 if I can find

10    strict but for causation that is called for by the

11    statute.

12        Here I would note that the Supreme Court has at

13    least once taken identical language, and I am thinking

14    of the residual cause under ACCA, and said that it is

15    not unconstitutionally vague for purposes of the

16    guidelines, it is unconstitutionally vague for purpose

17    of the statute.

18        I think the point of that, and some of the most

19    recent cases out of the Supreme Court on these kinds of

20    issues, is that context matters, and I think that it --

21    5K2.1 is -- presents a different context to me than

22    either the statute or 2D1.1.

23        I think it would be an anomalous result if the

24    guidelines prevented me from considering that the

25    substance provided by the defendant was a contributing

1    factor in the death of Sergeant Gavin, and I would say

2    that at the -- the state of the law, as it exists before

3    me now, I -- I think Pacheco is -- is more germane to

4    the -- to this case than Burrage.

5        That leaves the question of the extent of the

6    departure under a 5K2.1.  I may wish to hear a little

7    bit more from you with regard to -- I think maybe it

8    makes some sense, knowing that I find I am not

9    constrained from doing an upward departure under 5K2.1,

10   to let you argue your recommendations before I talk

11   really about any extent of the departure.

12       I will say that I don't think that this case would

13   support an upward departure under 5K2.21 in light of

14   Burrage.  I don't think the Government really had a

15   possible case it could have charged under 21 841 death

16   resulting.  So that would be a requirement under 5K2.21

17   that there would be a possible charge that was dropped,

18   and I don't -- I don't see that here.  Because I don't

19   think they could have ever proved but for causation.

20       With regard to the variance, I think I have the

21   freedom to -- to give an upward variance based on

22   essentially the same things that would support the

23   departure under 5K2.1, and I will go through those more

24   carefully as -- after I hear your recommendations.

25       All right.  I think maybe what I will do at this

1  point is put guideline calculations on the record.  So

2  this is a base offense level of 12.  Three points -- two

3  points are taken off for acceptance of responsibility

4  for a total offense level of 10.  Defendant was in a

5  criminal II history -- criminal history category, and

6  that gives us a guideline range of eight to 14 months.

7      Are there any objections to those findings?

8          MR. GUERRETTE:  No, Your Honor.

9          MR. ANDREWS:  No, Your Honor.

10          THE COURT:  All right.  And while I am on the

11  presentence investigation report, have you reviewed the

12  conditions of release with your client?

13          MR. ANDREWS:  I have, Your Honor.

14          THE COURT:  Are there any objections to any of

15  those?

16          MR. ANDREWS:  No, Your Honor, there are not.

17          THE COURT:  Okay.  Just let me talk to Mr.

18  Heindenstrom about that.  After any term of imprisonment

19  there will be a term of supervised release, and the

20  probation office has recommended certain conditions of

21  supervised release.  Those were contained in the

22  presentence report.  Do you remember those?

23          THE DEFENDANT:  Yes.

24          THE COURT:  And do you understand them?

25          THE DEFENDANT:  Yes, ma'am.

1            THE COURT:  Have you had enough time to talk to

2    your counsel about them?

3            THE DEFENDANT:  Yes.

4            THE COURT:  All right.  Those -- are there any

5    objections to any of those?

6            THE DEFENDANT:  No, Your Honor.

7            THE COURT:  All right.  Thank you.  Does counsel

8    want to see me at sidebar?

9            MR. ANDREWS:  I do, Your Honor.  I was just

10   going to ask.

11           THE COURT:  Yeah, why don't you ask.

12           MR. ANDREWS:  Your Honor, I would like to have a

13   sidebar to discuss a confidential matter.

14           THE COURT:  All right.

15              (Sealed sidebar conference.)

16                   (Open court.)

17           THE COURT:  All right.  Let me just state for

18   the record the documents that I have reviewed and -- and

19   relied on.  First of all was the victim impact statement

20   from Sergeant Gavin's mother, Kathleen; the Government's

21   sentencing memo; the Government's Exhibit 1; defendant's

22   sentencing memo memorandum; the defendant's attachments

23   which included a letter from Keith and Diane Reynolds; a

24   letter from James Prescott, III; a letter from Mark

25   Tanner; a letter from Robert Webber; a letter from

1   someone named Tyler who didn't give a last name; a

2   letter from Jim Horowitz and the attendance sheets that

3   are associated with that; a letter from Lieutenant

4   George Panenka; a letter from Steven Pyles; a letter --

5   documentation relating to the GED, or the HiSET as it is

6   now called; a letter from Rebecca Miller; and

7   certificates of completion of programs at the CCJ, I

8   think 12 of those; and some other documents that were in

9   -- in that as well but pertaining to those course --

10  that course work that you have been doing at the jail.

11  I have also considered Defendant's Exhibit 1 which was

12  the CV of Dr. Arden, and Defendant's Exhibit 2 which is

13  the letter from Dr. Arden, and of course Dr. Arden's

14  testimony here today.

15      Does counsel wish to comment on any of that

16  material?

17          MR. GUERRETTE:  No, Your Honor.

18          MR. ANDREWS:  No, Your Honor.

19          THE COURT:  All right.  And then I think I would

20  begin with hearing from Ms. Gavin.  I think I would like

21  to hear from her, and then I would like to hear from

22  anybody who wants to speak on behalf of the defendant.

23          MS. GAVIN:  I just have a photograph I would

24  like to.  That's all.

25          THE COURT:  Well, you wrote a very powerful

1  victim impact statement so.

2           MS. GAVIN:  Thank you.

3           THE COURT:  I am very sorry for your loss.

4           MS. GAVIN:  Do I give this to anybody?

5           THE COURT:  Sure, yeah.  Can we have it?

6           MS. GAVIN:  Yeah.

7           THE COURT:  Mark it as an exhibit?

8           MS. GAVIN:  Thank you.

9           THE COURT:  You don't want to mark it?

10          MR. GUERRETTE:  We talked about that earlier,

11  Your Honor.  We just didn't want it to be part of the

12  public file.

13          THE COURT:  Well -- okay.  Actually, I went

14  online and saw it anyway, but.

15          MS. GAVIN:  Thank you.

16          THE COURT:  Mm-hmm.  Okay.  Do you want to go?

17          MR. ANDREWS:  I do, Your Honor.  I would like to

18  call Lucas's mother to the stand.  Or not to the stand

19  but to the podium --

20          THE COURT:  Mm-hmm.

21          MR. ANDREWS:  -- to provide the Court with some

22  information.

23          THE COURT:  Good afternoon.

24          MS. HEINDENSTROM:  Good afternoon.  First, I

25  would like to say to the Gavin family I am so terribly

1    sorry for your loss and your pain, and I can't even

2    imagine, and it is such a terrible thing, and I hope

3    some day you find peace.  I truly do.

4         UNIDENTIFIED:  Thank you.

5         MS. HEINDENSTROM:  And -- I will control myself.

6    Lucas, my son that you see before you today, is not the

7    same person that he was those few years ago.  He was

8    lost back then, unfortunately, due to mistakes that his

9    father and I made.  We were so consumed in our own

10   problems that we didn't see that Lucas was lost, and he

11   felt unloved and unwanted, and that led him down his

12   path of drug use.  And I was so blind to it, I didn't

13   even know.

14       I didn't even know until one day I went to his house

15   and I said I want you to tell me right now what's wrong

16   with you, you don't look right, and then finally he told

17   me he was using heroin.  And of course I begged him to

18   stop, but that obviously doesn't work.

19       I spent the next, oh, several months every day

20   calling him on the phone to make sure he was alive and

21   every day telling him how much I loved him just in case

22   it was the last day.  And one time in the middle of the

23   night I got the phone call that I didn't want to get, I

24   was so afraid of getting, that he was unconscious on the

25   bathroom floor.  Fortunately he did wake up, and I spent

1    the next four days at his house afraid to leave him.

2        My son has made some terrible, terrible choices, and

3    some terrible mistakes, but I truly, honestly believe

4    that he is a different person.  He is not that person

5    anymore, and he accepts responsibility for his actions,

6    and I think that that's going to carry him through his

7    life to be able to live a better life and not go back

8    and make those same choices again.  And I ask you to

9    please just consider all of those things.

10       He has a very large support system and everyone that

11   is willing to help him and to support him in staying

12   clean, and living a better life, and being able to maybe

13   someday help someone through his own experiences and

14   thank you.

15            THE COURT:  Thank you.

16            MR. ANDREWS:  Your Honor, what I would like to

17   do is I would like to make some statements now that you

18   heard from Mrs. Heindenstrom.  In my sentencing

19   memorandum I structured this under the fact that Lucas

20   has been living in the darkness for some time.  A

21   darkness that first started out as a shadow --

22            THE COURT:  Mr. Andrews, is this going to be

23   your recommendation?

24            MR. ANDREWS:  No, not quite yet.

25            THE COURT:  Because I don't really want theater

1    in the way that --

2            MR. ANDREWS:  No.

3            THE COURT:  You know.

4            MR. ANDREWS:  I'm sorry.

5            THE COURT:  I want to take this the way we do a

6    sentencing every time.

7            MR. ANDREWS:  I -- I under --

8            THE COURT:  If you want to put that in part of

9    your -- your recommendation to me, I am happy to hear

10   you out on that; but I don't -- you know, it is feeling

11   a little staged, and I don't want to -- I don't want it

12   to be that way, all right?  There is a lot of

13   considerations here.

14           MR. ANDREWS:  And I am -- I am not trying to be

15   theatrical.  I am trying to structure it in a narrative

16   that will help the Court.

17           THE COURT:  I will get it.  I am pretty smart,

18   and I can get it when you give me your recommendation.

19      Is there anyone else who would like to speak on

20   behalf of the defendant?

21           MR. ANDREWS:  There is, Mr. Horowitz, Your

22   Honor.

23           THE COURT:  All right.  Good afternoon, sir.

24   Will you state your name and spell your last name for

25   the record.

1          MR. HOROWITZ:  Certainly.  James Horowitz,
2    H-o-r-o-w-i-t-z.
3          THE COURT:  Mm-hmm.  Mr. Horowitz, I read your
4    letter.
5          MR. HOROWITZ:  Thank you.
6          THE COURT:  Mm-hmm.
7          MR. HOROWITZ:  And I have been a SMART Recovery
8    instructor and facilitator for the past five years.  I
9    work five days a week at Cumberland County Jail and
10   Maine Correctional Center in Windham.  I have met with
11   thousands of inmates.  I have conducted these meetings.
12   I have provided certificates of attendance, and
13   occasionally, rare occasions, submitted a personal
14   letter, and normally I would not be inclined to come to
15   a hearing for someone in that capacity.  And, in fact,
16   this is the first and only time I have.
17        And I have done that really just to try to relay the
18   serious -- the real conscientious and seriousness that
19   Lucas has taken towards his recovery, and even more
20   significantly to helping others.
21        So he has attended virtually every meeting -- I
22   don't know anyone else that's done that -- that I have
23   conducted at CCJ.  And in addition to really
24   understanding the material.  SMART is a science-based,
25   evidence-based protocol.  So he has absorbed that

1    information.  And he has also really become a leader for

2    other inmates in the -- in the jail, and I think that's

3    really, you know, telling.

4        In fact, I really do believe that Lucas will go on

5    to use the experiences, and the suffering he has done,

6    and the things he has learned, not only for his own good

7    and -- and -- and, you know, living a healthy, sober,

8    and balanced life but also in helping others, too.

9    That's pretty much what I wanted to say though.

10        THE COURT:  Thank you.  I appreciate it.  And I

11    understand that it means a lot for you to come here

12    because you don't generally do that and --

13        MR. HOROWITZ:  The only time.

14        THE COURT:  -- it must mean -- it must mean

15    something.  Thank you.

16        MR. HOROWITZ:  Thank you.

17        MR. ANDREWS:  Your Honor, Lucas would like to

18    speak.

19        THE COURT:  All right.  I am going to give the

20    chance to recommendations first and then I am going to

21    hear from the defendant, all right?  Mr. Guerrette.

22        MR. GUERRETTE:  This -- it is a tragic case.  It

23    is one that resulted in the premature death of a

24    29-year-old veteran who served tours in Iraq and

25    Afghanistan.  He was awarded the Purple Heart for valor.

1    But more importantly he was a son, he was a brother, he

2    was a father.

3         The Court has found that the defendant's actions on

4    March 30, 2016, contributed to Kyle's death.  It was

5    unquestionably part of a cocktail that resulted in that

6    death.

7         In many case, Your Honor, this case is

8    representative of tragedy that we're seeing across the

9    State of Maine, across the nation, from the distribution

10   and use of these illicit controlled substances including

11   fentanyl and its analogs.  Daily families are losing

12   loved ones to this epidemic.  And unfortunately the

13   sober reality that we're -- we're dealing with, there is

14   probably no end in sight when you are dealing with a

15   substance as toxic, as addictive, and as lethal as

16   fentanyl, and we're going to continue to see fatalities

17   and tragedies.

18        In many ways, the defendant himself is a casualty of

19   this epidemic.  We don't dispute that he was an addict.

20   We don't dispute that he was distributing to his

21   acquaintances to support his own addiction.

22        The presentence report outlines a lengthy history of

23   addiction again that the Government does not dispute.

24   His arrest history appears to be related to his

25   substance abuse issues.

1          So his addiction to opiates has likewise had some

2     pretty severe consequences in his life including the

3     current legal predicament that he is now facing and the

4     chance that he is going to serve some additional terms

5     of years in imprisonment.

6          But fortunately for him, Your Honor, and his family,

7     the consequences pale in comparison to what the Gavin

8     family has experienced in this case.

9          It is -- it is a hard case.  My office has struggled

10    with the recommendation in this case.  How do you place

11    a number on this?  You know, before this case, though he

12    had a number of brushes with the law, he had never --

13    the defendant's never served a term of imprisonment.  It

14    has been mostly just fines and suspended sentences.

15         So after discussion I know internally with our

16    office, looking at his history, looking at the facts and

17    circumstances of this case, discussions with the Gavin

18    family, in his plea agreement we ultimately believed and

19    agreed that a sentence of no more than 96 months was --

20    was appropriate for a total punishment in this case, and

21    we still do.  I mean that would be the -- the position

22    of the office, Your Honor.

23         Here clearly and I think the Court has -- has found

24    that a sentence in the current guideline range would not

25    accomplish the goals set forth in the sentencing statute

1  because it would dilute the consequences of the crime of

2  distribution.

3      So we would ask the Court to consider the facts and

4  circumstances of the case, the fact that the offense had

5  a meaningful impact on -- on the cause of death in this

6  case, and all the other information that's before the

7  Court in the presentence report and otherwise, in

8  determining a just sentence.  And ultimately we would

9  ask that whatever sentence the Court impose also be

10 structured to give the defendant an opportunity to -- to

11 pursue rehabilitative treatment when he is incarcerated.

12         THE COURT:  All right.

13         MR. GUERRETTE:  Thank you.

14         THE COURT:  Thank you, Mr. Guerrette.  Mr.

15 Andrews.

16         MR. ANDREWS:  Your Honor, the recommendation

17 that I am going to make is for 30 months in this case.

18 I am going to do that based on all of the 33 -- 3553

19 factors.  In particular, Your Honor, a sentence that is

20 not more than necessary.

21     Mr. Heindenstrom has -- has accomplished a

22 significant amount of personal growth since turning

23 himself in.  When I first got this case what was

24 remarkable to me was the lack of insight that my client

25 had both into himself and to what he had done.  It took

1  me a while to learn, as I started to say earlier, about

2  the shadow that had overcast his youth and which

3  eventually turned in to complete darkness.

4      He was at a -- a particular point, and as his lawyer

5  I have done what a lawyer does to -- to get someone like

6  him who is addicted to drugs treatment and on the right

7  path, and while that didn't occur immediately it has

8  occurred.

9      The other day we were talking about what was -- what

10  was different, and for the first time I realized that --

11  that Lucas did understand.

12      The story that -- that he tells is that when he

13  turned himself in for a while he was bitter, right.  For

14  a while he -- he kept thinking to himself, oh, why is

15  everything so terrible?  Why am I so terrible?  And --

16  and one day he had had enough.

17      And I -- I can sort of relate to it based on his

18  story about, you know, how often he heard that he wasn't

19  a good person, and that he wasn't successful, and that

20  he was sort of going to live a miserable existence, I

21  can sort of understand that.  And what he said is I had

22  enough of that and so I applied to -- to get my GED.

23      And I think it was around the early part of March,

24  maybe March 3rd, and -- that he did this, and he took

25  the test, and -- and for the first time, as he explained

1    it, he had had some success.  Some success that -- that

2    made him feel like all of that stuff maybe wasn't true.

3    And so he started participating in more programs, and he

4    started getting the treatment, and -- and I have

5    detailed it all in the -- in the sentencing memorandum.

6        And while things aren't perfect right now, and, you

7    know, maybe at sentencing we -- we tend to -- to present

8    the picture of everything is going to be perfect, I am

9    not saying that we're there yet, right.  What I am

10   saying is that we have made substantial gains.  He at

11   least understands what happened and why.  And he has at

12   least begun the process of working to ensuring, as he

13   likes to say, that he is never a part of anything like

14   this again.

15       And that, Your Honor, is why I think which is -- and

16   the 30 months is basically time served for Mr.

17   Heindenstrom -- why I think that is not more than

18   necessary, right.  I think -- I think he has achieved

19   what it is that we hope to do with respect to the

20   purposes of sentencing.  And I would also like to

21   indicate that a 30-month sentence is a substantial

22   enhancement over the eight to 14 that his guideline

23   range is, right, and I think that's important.

24       I think that's important because whatever sentence

25   this Court imposes, it must be reasonable.  And without

1    diminishing respect for the law or the seriousness of

2    this crime, I think 30 months does that.  Thank you.

3              THE COURT:  Thank you, Mr. Andrews.

4        Mr. Heindenstrom, you have a constitutional right to

5    address the Court.  Is there anything you want to say?

6    You can say it at this time.

7              THE DEFENDANT:  Yes, Your Honor.  First of all,

8    I would like to -- I would like to tell you how terribly

9    sorry I am.  I am sorry for my actions and the

10   selfishness and my addiction that played a role in the

11   loss of Kyle.  I can't imagine the pain that I have

12   caused your family, and there is nothing I can do to

13   ease that pain, and I will carry that weight for the

14   rest of my life, and I deserve to carry that weight.  I

15   truly am sorry.

16       I wrote a speech for today, I prepared a speech, and

17   I have decided -- although I would like you to have it,

18   I decided not to read it.  Instead I would like to talk

19   to you about who I am today and the man that stands here

20   rather than the boy that stood in front of you two years

21   ago.

22       When I was first arrested on the federal warrant, I

23   was at my absolute lowest, and I was only getting worse

24   by the day.  I spent two -- two months detoxing in

25   Cumberland County before I was approved a bed at

1    St. Francis.  And St. Francis was a great experience and

2    I did learn a lot, but it didn't change the years of

3    damage that were already done.

4        When I was released on bail, all those emotions that

5    I suppressed and -- and I buried with drugs and alcohol

6    came out, and I was scared, and I did what I always do,

7    and that's use.  In this case I was drinking.

8        After -- after a couple months, a short time, I was

9    -- I turned myself in on bail violation for drinking,

10   and I was back in jail.  And I was mad.  I was mad at

11   the world.  I was mad at everybody for -- for me being

12   there.  And I was -- I was depressed.  And I started --

13   instead of using drugs and alcohol, I was -- I was

14   eating, I was sleeping, I was hiding, and I got

15   unhealthy, and people started to notice, and they'd tell

16   me how unhealthy I was.  And then I noticed.  And I took

17   -- I took a day and I -- I went -- I was in my cell and

18   I cried.  And like when I say I cried, I mean like I --

19   I really cried.  I cried for Kyle.  I cried for his

20   family.  I cried for my family.  And I cried for

21   everything that I was burying for all those years.  And

22   I let everything out.  And I decided that I was going to

23   do something different.

24       The next day I signed up for my high school diploma.

25   And I was terrified.  People were going to laugh at me.

I was going to look stupid.  I wasn't going to be good

enough.  And to my surprise I -- I did very well.  Like

very well.  I tested out.  And I fed off of that

accomplishment, and I took that experience to try -- try

to better myself.

I -- I signed up for every program possible.  I

started eating right.  I started exercising.  Not only

did I complete every program, but I pushed myself.  I

asked questions.  I helped others.

I made a terrible mistake, and I'm sorry for that

mistake.  I can't change what I have done, but I can

make sure that I am never involved with anything like

this ever again.  And I know that I am not a bad person,

and I am early in my recovery, but I am trying my best,

and I am proud of who I am today.  Thank you.

THE COURT:  Thank you.

MR. ANDREWS:  Your Honor, in a -- in a practical

sense, sort of to end my recommendation, in -- in my

view it is important that we preserve the right of

appeal, and I just want to let the Court know that there

is an appeal waiver for a sentence that is 48 months or

less, and we're asking that if the Court thinks that

sentence is a departure beyond what my recommendation is

that it at least be 49 months so that I can have that

right -- or that Mr. Heindenstrom can have that right to

1    appeal.  Thank you.

2         THE COURT:  All right.

3         MR. ANDREWS:  Oh, Your Honor, I'm sorry.  Mr.

4    Heindenstrom does ask that this be given to the Court.

5         THE COURT:  All right.  I will mark it as a

6    defendant's exhibit.

7         MR. ANDREWS:  Thank you.

8         THE COURT:  Any objection?

9         MR. GUERRETTE:  No, Your Honor.

10        THE COURT:  All right.  All right.  I have

11   decided to accept the plea agreement in this case.  I

12   have carefully reviewed the contents of the written pre

13   -- presentence report.  I take those contents into

14   account.  I consider what I have heard from counsel both

15   in today's proceedings and as well as the presentence

16   conference.  I consider the evidence that was presented

17   at this hearing.  And I consider the allocution of the

18   defendant.

19       Under the law, I am required to impose a sentence

20   that's sufficient but not greater than necessary to

21   serve essentially the four purposes of sentencing, and

22   those purposes are just punishment, deterrence,

23   protection of the public, and your rehabilitation.

24       I take into account the nature and circumstances of

25   every offense.  I take into account the defendant's

1    history and the defendant's characteristics.  I consider

2    the sentencing guidelines.  I consider the need to avoid

3    unwarranted sentencing disparities.  And I have

4    considered all of those factors.

5        Before I actually impose sentence, I want to explain

6    what I am thinking a little bit.  First of all, with

7    regard to the nature and circumstances of this offense,

8    you have pled guilty now to distributing fentanyl.  And

9    it is clear that you are not a major drug dealer, but

10   you sold drugs to support your habit.  And you thought

11   you were selling heroin, but you were aware that the

12   substance that you had contained fentanyl, and I think

13   it turned out to be pure fentanyl.

14       Am I right about that?  No.

15           MR. GUERRETTE:  No.

16           THE COURT:  It was both, mixed?

17           MR. GUERRETTE:  Contained fentanyl.

18           THE COURT:  Just contained fentanyl.

19           MR. GUERRETTE:  Yes.

20           THE COURT:  Okay.  I don't know where I got

21   that, but anyway.  I will strike it from my brain.

22       In my view, the guideline range for this charge is

23   woefully insufficient for what happened here, and what

24   happened here was that your customer, Sergeant Gavin,

25   who had a distinguished military career, and who was no

1    doubt struggling himself with the horrors that he saw on

2    his tours of duty, he bought and consumed that fentanyl,

3    or that heroin with fentanyl.  And we certainly can't

4    say that that was the cause of death, but it contributed

5    to his death.  And the fact of his death just has to

6    take this case out of the guideline range in my view.

7        When I see your crime I have to see not just what

8    you did but the effects that it had, and it had a

9    terrible effect obviously on Sergeant Gavin, and it had

10   a terrible effect on his family, and it had a terrible

11   effect on our community.  He was a great guy.  He was

12   helping people selflessly.  It was a loss all the way

13   around.  So that's the nature and circumstances of the

14   offense.

15       When I look at your history and your

16   characteristics, I see someone now 20 -- are you 28 now?

17            THE DEFENDANT:  Mm-hmm.

18            THE COURT:  28 years old.  Your childhood was

19   somewhat dysfunctional.  You had ADHD as a kid.  You

20   were also diagnosed with oppositional defiant disorder.

21   There was a lot of turmoil -- turmoil in your home.  And

22   your mom described it very well that, you know, they

23   were dealing -- your parents were dealing with their own

24   issues and they didn't really see -- they were really

25   absorbed there and didn't see that you were kind of

1    falling through the cracks.

2        And when you -- when they divorced and you went with

3    your father, you know, you were -- it really seems like

4    you were essentially on your own, and you were out there

5    getting beaten up by other kids and bullies in school.

6    It is a terrible situation for any kid to be in, no

7    question.

8        You finally went back to live with your mom and you

9    became close with her, and that was one very good thing.

10       We see you starting to use drugs at a very young

11   age, which is quite common for someone sitting in that

12   chair.  You started marijuana at 13, experimented with

13   benzos and molly, used alcohol, Percocet, Vicodin.  In

14   2014 you started heroin and you became hooked on that.

15       When you are using, you are a danger to this

16   community.  You ran into somebody's house when you were

17   intoxicated driving a car.  There was an arrest for

18   leaving the scene of an accident and an arrest for an

19   OUI that didn't result in a charge but in which you

20   admitted that you had been drinking.  That was the one

21   where -- that brought you back into federal court for --

22   and we revoked your bail.  So you were on pretrial

23   release at the time of that.

24       Those are real markers to me of serious substance

25   use disorder, and the only way you will ever not be a

 1    danger to the community is if you really beat your

 2    addiction.

 3        You did try IOP for a short time immediately after

 4    this incident occurred, it looks like from the

 5    presentence report, but you left that program.  Your mom

 6    says you ran out of insurance money.  Then you had the

 7    six-week stint at St. Francis for inpatient residential

 8    treatment.  That ended in October of 2016.  That

 9    probably wasn't long enough either.

10        I was so disappointed to read in the presentence

11    report that after St. Francis while you were still out

12    on pretrial release you failed to attend a substance

13    abuse IOP program.  And, quite predictably, failing to

14    attend that program you ended up relapsing and being

15    brought into custody at the end of -- of January of

16    2017.

17        I think the point I want to make about that -- and I

18    am sure Mr. Horowitz will agree with me -- treatment for

19    you is absolutely essential, and you can't get enough

20    treatment.

21        And I applaud your efforts to take advantage of

22    every resource that the jail has, and I am definitely

23    going to support your request to get into the 500-hour

24    treatment program in the federal Bureau of Prisons; but

25    the sad reality is that if you have substance use

1    disorder going in to prison, you are going to have

2    substance use disorder coming out of prison.  It is just

3    not something you can cure in prison, and the challenges

4    are very different in prison.

5        So you might be able to abstain in prison, but when

6    you get out -- kind of like you said with getting out of

7    St. Francis -- you face a wave of emotion, you face

8    challenges that you didn't have, and you have

9    temptations.  You have got drugs more easily accessible.

10   So the real -- the rubber is really going to hit the

11   road when you get out of prison and you get into

12   supervised release.  At that point you are going to have

13   to double down and really focus on making sure you get

14   the level of treatment that you need, and that you go,

15   and that you attend every -- every one.  Because without

16   treatment -- it has been proven you will need at least

17   300 hours of treatment once you get out, that's after

18   all of that other stuff, just to re-enter and be

19   successful, because you have got high risk and high

20   needs written all over you.  And you have got to deal

21   with your mental health issues, and you have got to deal

22   with those substance abuse issues, or you are going to

23   be returning to become a danger to the community.

24       I think you get that.  I think your allocution was

25   very good.  I -- I hear you, and I understand that you

1    have thought very deeply about this.

2        The fact that Mr. Horowitz is here to speak on your

3    behalf is significant because those people see it all

4    and they -- they see jailhouse conversions every day.

5    The fact that he came in here to speak on your behalf is

6    significant.

7        A lot is going to be dependent on your attitude when

8    you come out because the Bureau of Prisons is not a walk

9    in the park, and there will be a lot of people there

10   that would take you down a road that you do not want to

11   go down.  And if you can get through that and come out

12   with a positive attitude, I think you can turn it

13   around.  I -- I believe you have it in you to do what

14   you say you want to do:  to help other people, to become

15   educated in that field, to use your experiences to -- to

16   try to remedy some of the wrong that you have -- that

17   you have done on this case.

18       What I would advise you is to see your probation

19   officer as a support and not an enemy.  They are going

20   to be trying to make sure you get what you need, that

21   you get the treatment that you need, that you go to the

22   treatment.  They are going to be randomly frequently

23   observing drug tests.  They are going to be holding your

24   feet to the fire.  And you should be thanking them every

25   day for doing it.

1       If you mess up and you relapse, they are going to

2   get you a higher level of treatment.  If you keep

3   messing up, they are going to bring you before me.  If

4   you tamper with a drug test, you are going to be coming

5   before me.  If you fail to attend treatment, you are

6   going to be coming before me.  And that won't be pretty.

7   I can assure you of that.

8       What I am going to do with regard to extent of the

9   departure -- this is under 2K2.1 -- that depends on the

10  dangerousness of the defendant's conduct, the extent to

11  which death was intended or knowingly risked, the extent

12  to which the guideline reflects the risk of personal

13  injury.  Those are the -- the factors.

14      Clearly the defendant's conduct of distributing a

15  substance known to contain fentanyl was extremely

16  dangerous.  Fentanyl is extremely potent.  As we

17  learned, it can be far more potent than heroin.  There

18  is no knowing what the -- the purity of anything is

19  anymore.  I mean we're -- they're putting it in things

20  as an additive.  We don't even know what we're dealing

21  with.

22      In March of 2016, as I said, it was widely known

23  that heroin and fentanyl were responsible for a

24  significant uptick in the number of overdose deaths, so

25  it is very dangerous conduct.

1    As for the defendant's state of the mind, the
2    defendant clearly did not intend to cause Sergeant
3    Gavin's death.  He had mentioned that the substance --
4    that -- that somebody else had already tried that same
5    -- from that same batch, and that they had loved it, so
6    he was not aware that it would -- could cause death; but
7    he was aware that it was fentanyl, that's clear from the
8    texts that you sent.  And, as I said, there was just
9    this buzz in the press that fentanyl was causing
10   overdose deaths.  I can infer from the text that you saw
11   the fentanyl as being whatever it was that gave the kick
12   to what you were providing.
13       So I think you knew you were playing with fire, and
14   so as far as your state of mind I would say that there
15   is -- it is -- it is not that you intended to cause
16   death -- death, but it was something that you were
17   knowingly risking.
18       I think that the same factors that support the 5K2.1
19   fact -- upward departure would also support the
20   variance.  I would also note that I think that an eight
21   to 14-month guideline range for distribution of a small
22   amount of fentanyl just does not capture the seriousness
23   of a crime where death results at least in part from the
24   drug that was distributed.
25       I also would say that I don't think that a guideline

1    sentence would provide an adequate deterrent to other

2    people who are distributing fentanyl, so I -- that would

3    be another basis on which I would either vary upward or

4    do a 5K2.1 departure.

5        All right.  If you would stand, I will impose the

6    sentence.  The defendant is hereby committed to the

7    custody of the United States Bureau of Prisons to be

8    imprisoned for a total term of 60 months.  I am going to

9    recommend to the Bureau of Prisons that they consider

10   you for enrollment in the 500-hour comprehensive drug

11   treatment program.

12       I am going to impose a period of supervised release

13   for a term of three years.

14       I will impose all of the conditions, mandatory,

15   standard and special, that have been recommended by the

16   probation office for your supervised release.

17       I am imposing a $100 assessment.  I find that the

18   defendant does not have the ability to pay a fine, I am

19   going to waive the fine in this case.  The assessment is

20   due in full immediately.  If you can't pay it

21   immediately, you can pay it over the term of your

22   incarceration.  If you can't pay it over the term of

23   your incarceration, you can pay it over the term of your

24   supervised release in monthly payments set by the

25   probation officer.  If you can't afford those payments,

1   then you can come back to the Court and -- and seek an

2   adjustment.

3       So, in your plea agreement you waived your right to

4   appeal any sentence of 48 months or less, so since this

5   is over that you have the right to an appeal.  In order

6   to appeal, you have to cause to be filed with the clerk

7   of this court within 14 days of today, and not after

8   that, a written notice of appeal.  Do you understand?

9   You have to say yes or no.

10          THE DEFENDANT:  Yes.

11          THE COURT:  I advise that if you fail to timely

12  file the written notice of appeal, you will have given

13  up your right to appeal the sentence and conviction.  Do

14  you understand that?

15          THE DEFENDANT:  Yes.

16          THE COURT:  And if you can't afford to file the

17  appeal, you can appeal without cost to you.  On your

18  request, the clerk of the Court will immediately prepare

19  and file a notice of appeal on your behalf.  Do you

20  understand?

21          THE DEFENDANT:  Yes.

22          THE COURT:  Anything from probation?  Did I --

23  nothing?

24          PROBATION OFFICER:  Nothing, Your Honor.

25          THE COURT:  Anything more for the Government?

1          MR. GUERRETTE:  Your Honor, may I ask a

2   clarifying question?  I think the Court alluded to it on

3   a couple of different occasions, but would the Court

4   have nevertheless imposed a 60-month sentence pursuant

5   to an upward variance and -- in the event that there is

6   -- there is an issue with the upward departure?

7          THE COURT:  Yeah, I would have based it either

8   on the 5K2.1 and if I couldn't have done that I would

9   have based it at -- I would have given it as an upward

10  variance.

11          MR. GUERRETTE:  Thank you, Your Honor.

12          THE COURT:  I am not even sure what -- if I

13  didn't just do both, but that's what it is based on.

14          MR. GUERRETTE:  I think you did.  I just wanted

15  to be sure.

16          THE COURT:  Yep.  Okay.  Anything further for

17  you, Mr. Andrews?

18          MR. ANDREWS:  To the extent that this is

19  justified as an upward variance, I just want to make

20  sure that the Court is aware and that we preserve the

21  objection to that sentence.

22          THE COURT:  Yep.  You are -- your objections I

23  think are adequately preserved.

24          MR. ANDREWS:  Thank you, Your Honor.

25          THE COURT:  And I would just like to apologize

1   for my comment to you about the theater.  I didn't mean

2   to disparage you in any way, but I just wanted to do it

3   the same way I always do it in every case.

4            MR. ANDREWS:  I -- I understand, Your Honor, and

5   I --

6            THE COURT:  Yeah.  All right.  I want to wish

7   you luck, Mr. Heindenstrom.  I -- I really do believe

8   that you can -- you can do this, and I think you owe it

9   to yourself, and I think you owe it to your family, and

10  I think you owe it to everybody in this courtroom.  And

11  I also want to say that I am very, very sorry for the

12  victim's loss here.  The Court will be in recess.

13            (TIME NOTED:  3:25 p.m.)

14

15

16            **C E R T I F I C A T I O N**

17       I, Tammy L. Martell, Registered Professional

18  Reporter, Certified Realtime Reporter, and Official

19  Court Reporter for the United States District Court,

20  District of Maine, certify that the foregoing is a

21  correct transcript from the record of proceedings in the

22  above-entitled matter.

23       Dated:  March 11, 2019

24            /s/ Tammy L. Martell

25            Official Court Reporter